**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FRANCISCO ALVAREZ; F.M.A., a minor, by and through his guardian Francisco Alvarez; JEREMY WAHL; I.W., a minor, by and through her guardian Jeremy Wahl, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 1:26-cv-10773

District Judge April M. Perry

# DEFENDANT META PLATFORMS, INC.'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....................................................................................................1

FACTUAL BACKGROUND ....................................................................................2

LEGAL STANDARD ..............................................................................................5

ARGUMENT ..........................................................................................................5

I. PLAINTIFFS' BIPA CLAIMS FAIL ..................................................................5

A. Meta Is Not Subject To BIPA Because It Is Exempt Under Section 25(c) ..........6

B. Plaintiffs Do Not Plead Facts Plausibly Alleging Meta Collected Or Possessed Their Biometric Identifiers ..........9

C. Plaintiffs Lack Article III Standing To Pursue Their Section 15(a) Claim ..........19

II. PLAINTIFFS' CALIFORNIA RIGHT OF PUBLICITY CLAIMS FAIL ..........20

A. Plaintiffs Do Not Plausibly Allege That Meta Used *Their* Identities ........21

B. Plaintiffs Consented To Meta's Use Of Their Images ..........21

C. Plaintiffs Do Not Plausibly Allege Commercial Appropriation ..........25

III. PLAINTIFFS' CALIFORNIA CONSTITUTIONAL PRIVACY CLAIM FAILS ..........27

CONCLUSION ......................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Almeida v. Amazon.com, Inc.*,
456 F.3d 1316 (11th Cir. 2006) ..... 26

*Ambrozewicz v. 6Sense Insights, Inc.*,
804 F. Supp. 3d 1026 (N.D. Cal. 2025) ..... 25, 26

*Andersen v. Stability AI Ltd.*,
700 F. Supp. 3d 853 (N.D. Cal. 2023) ..... 26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 5

*Atkins v. City of Chicago*,
631 F.3d 823 (7th Cir. 2011) ..... 13

*Badgerow v. Walters*,
596 U.S. 1 (2022) ..... 9

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 5, 12

*Brooks v. Thomson Reuters Corp.*,
2021 WL 3621837 (N.D. Cal. Aug. 16, 2021) ..... 25

*Bryant v. Compass Grp. USA, Inc.*,
958 F.3d 617 (7th Cir. 2020) ..... 20

*Carson v. Michaels Stores, Inc.*,
2011 WL 2120195 (Cal. App. May 31, 2011) ..... 29

*Castaneda v. Amazon.com, Inc.*,
679 F. Supp. 3d 739 (N.D. Ill. 2023) ..... 5

*Chi. Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of Chi.*,
963 N.E.2d 918 (Ill. 2012) ..... 9

*Cisneros v. Nuance Commc'ns, Inc.*,
189 F.4th 621 (7th Cir. 2026) ..... 6, 9

*Cnty. of Los Angeles v. Super. Ct.*,
65 Cal. App. 5th 621 (2021) ..... 28

*Cousin v. Sharp Healthcare*,
681 F. Supp. 3d 1117 (S.D. Cal. 2023) ........ 30

*Cross v. Facebook, Inc.*,
14 Cal. App. 5th 190 (2017) ........ 21, 25, 26, 27

*D'Angelo v. FCA US, LLC*,
726 F. Supp. 3d 1179 (S.D. Cal. 2024) ........ 29

*Doe v. Northwestern Univ.*,
586 F. Supp. 3d 841 (N.D. Ill. 2022) ........ 7, 8, 9

*Duerr v. Bradley Univ.*,
590 F. Supp. 3d 1160 (C.D. Ill. 2022) ........ 6, 7, 8, 9

*Four Navy Seals v. Associated Press*,
413 F. Supp. 2d 1136 (S.D. Cal. 2005) ........ 30

*Fox v. Dakkota Integrated Sys., LLC*,
980 F.3d 1146 (7th Cir. 2020) ........ 20

*G.T. v. Samsung Elecs. Am., Inc.*,
742 F. Supp. 3d 788 (N.D. Ill. 2024), *aff'd*, 186 F.4th 470 (7th Cir. 2026) ........ 15, 16, 19

*Gionfriddo v. Major League Baseball*,
94 Cal. App. 4th 400 (2001) ........ 21

*Harvey v. Resurrection Univ.*,
2022 WL 3716213 (N.D. Ill. Aug. 29, 2022) ........ 8

*Hill v. NCAA*,
865 P.2d 633 (Cal. 1994) ........ 27, 28

*Hill v. Workday, Inc.*,
2024 WL 3012802 (N.D. Cal. June 14, 2024) ........ 30

*Hogan v. Amazon.com, Inc.*,
2022 WL 952763 (N.D. Ill. Mar. 30, 2022) ........ passim

*Huston v. Hearst Commc'ns, Inc.*,
53 F.4th 1097 (7th Cir. 2022) ........ 26

*Ibarra v. Super. Ct.*,
217 Cal. App. 4th 695 (2013) ........ 28

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........ 22, 25

*In re Google Generative AI Copyright Litig.*,
809 F. Supp. 3d 903 (N.D. Cal. 2025) .................................................................. 12, 17

*In re Mosaic LLM Litig.*,
2025 WL 2402677 (N.D. Cal. Aug. 19, 2025) ................................................................ 12

*In re Yahoo Mail Litig.*,
7 F. Supp. 3d 1016 (N.D. Cal. 2014) .................................................................. 27, 28

*Jacobs v. Hanwha Techwin Am., Inc.*,
2021 WL 3172967 (N.D. Ill. July 27, 2021)................................................................ 16

*Javid v. M.A.C. Cosms., Inc.*,
2026 WL 1601454 (N.D. Ill. June 4, 2026) .................................................................. 15

*Ji v. Naver Corp.*,
2023 WL 6466211 (N.D. Cal. Oct. 3, 2023).................................................................. 18

*Johnson v. Amazon.com Servs. LLC*,
177 F.4th 904 (7th Cir. 2026) ........................................................................................ 9

*LaBella Winnetka, Inc. v. Village of Winnetka*,
628 F.3d 937 (7th Cir. 2010) ........................................................................... 5, 22, 24

*Lax v. Mayorkas*,
20 F.4th 1178 (7th Cir. 2021) .................................................................................. 5, 22

*Lightbourne v. Printroom Inc.*,
122 F. Supp. 3d 942 (C.D. Cal. 2015) .......................................................................... 21

*Lugosi v. Universal Pictures*,
25 Cal. 3d 813 (1979) .................................................................................................. 25

*Martell v. X Corp.*,
2024 WL 3011353 (N.D. Ill. June 13, 2024) ......................................................... 15, 18

*McGoveran v. Amazon Web Servs., Inc.*,
175 F.4th 434 (3d Cir. 2026) ...................................................................................... 6, 9

*Mosley v. Gen. Revenue Corp.*,
2020 WL 4060767 (C.D. Ill. July 20, 2020)................................................................. 19

*Newcombe v. Adolf Coors Co.*,
157 F.3d 686 (9th Cir. 1998) ...................................................................................... 27

*Parungao v. Cmty. Health Sys., Inc.*,
858 F.3d 452 (7th Cir. 2017) ........................................................................................ 5

*Patterson v. Respondus, Inc.*,
593 F. Supp. 3d 783 (N.D. Ill. 2022) .......... 20

*Payton v. Union Pac. R.R. Co.*,
-- F.4th --, 2026 WL 2936342 (7th Cir. Sept. 30, 2026) .......... 8

*Perfect 10, Inc. v. Google, Inc.*,
2010 WL 9479060 (C.D. Cal. July 30, 2010), *aff'd*, 653 F.3d 976 (9th Cir. 2011) .......... 21

*Pioneer Elecs., Inc. v. Super. Ct.*,
40 Cal. 4th 360 (2007) .......... 29

*Powell v. DePaul Univ.*,
2022 WL 16715887 (N.D. Ill. Nov. 4, 2022) .......... 8, 9

*Rivera v. Google Inc.*,
238 F. Supp. 3d 1088 (N.D. Ill. 2017) .......... 17

*Roake v. Forest Pres. Dist. of Cook Cnty.*,
849 F.3d 342 (7th Cir. 2017) .......... 5

*Robinson v. Meta Platforms, Inc.*,
2026 WL 2722540 (N.D. Cal. Sept. 15, 2026) .......... 24, 25

*Saleh v. Nike, Inc.*,
562 F. Supp. 3d 503 (C.D. Cal. 2021) .......... 29, 30

*Shaw v. Regents of Univ. of Cal.*,
58 Cal. App. 4th 44 (1997) .......... 22, 23

*Sloan v. Anker Innovations Ltd.*,
711 F. Supp. 3d 946 (N.D. Ill. 2024) .......... 10

*Stackler v. Dep't of Motor Vehicles*,
105 Cal. App. 3d 240 (1980) .......... 29

*Strautins v. Trustwave Holdings, Inc.*,
27 F. Supp. 3d 871 (N.D. Ill. 2014) .......... 12

*TBG Ins. Servs. Corp. v. Super. Ct.*,
96 Cal. App. 4th 443 (2002) .......... 30

*Times-Mirror Co. v. Super. Ct.*,
198 Cal. App. 3d 1420 (1988), *opinion modified on denial of reh'g* (Mar. 25, 1988) .......... 28

*Tseng v. PeopleConnect, Inc.*,
665 F. Supp. 3d 1136 (N.D. Cal. 2023) ........ 25

*Vrdolyak v. Avvo, Inc.*,
206 F. Supp. 3d 1384 (N.D. Ill. 2016) ........ 26

*Watts v. Emergency Twenty Four, Inc.*,
2021 WL 2529613 (N.D. Ill. June 21, 2021) ........ 19

*White v. Samsung Elecs. Am., Inc.*,
971 F.2d 1395 (9th Cir. 1992) ........ 25

*Zellmer v. Meta Platforms, Inc.*,
104 F.4th 1117 (9th Cir. 2024) ........ passim

**STATUTES**

12 U.S.C. § 1843(k)(4)(A) ........ 6

15 U.S.C. § 6809(3)(A) ........ 6

15 U.S.C. § 6809(6) ........ 7

740 ILCS 14/10 ........ 2, 9

740 ILCS 14/15(a) ........ 1, 20

740 ILCS 14/15(b) ........ 1

740 ILCS 14/25(c) ........ passim

740 ILCS 14/25(e) ........ 8

Cal. Civ. Code § 3344(a) ........ 21, 25

**REGULATIONS**

16 C.F.R. § 313.3(k)(1) ........ 7

**OTHER AUTHORITIES**

AI Disclosures, https://www.facebook.com/legal/meta-AI-disclosures ........ 4

Articles of Amendment Filed with Fla. Div. of Corps., Doc. No. P10000100169
(July 2022), https://search.sunbiz.org/Inquiry/CorporationSearch/
ConvertTiffToPDF?storagePath=COR%5C2022%5C0718%5C90966668.
Tif&documentNumber=P10000100169 ........ 7

Buchodi, *Meta's Smart Glasses Companion App Ships a Complete, Dormant Face-Recognition Pipeline on a Stock Account* (June 4, 2026), https://www.buchodi.com/meta-glasses-facial-recognition/ .................... 4

Cal. Dep't of Bus. Oversight, Directory of Money Transmitters (captured July 25, 2013), https://web.archive.org/web/20130725001426/http://www.dbo.ca.gov/Licensees/money_transmitters/money_transmitters_directory.asp. .................... 7

Dhruv Mehrotra & Dell Cameron, *Meta Silently Added Face-Recognition Code for Its Smart Glasses to Millions of Phones*, WIRED (June 4, 2026), https://www.wired.com/story/meta-smart-glasses-face-recognition-nametag-connections/ .................... 4

Xiaoliang Dai et al., *Emu: Enhancing Image Generation Models Using Photogenic Needles in a Haystack* ARXIV (Sept. 27, 2023), https://arxiv.org/pdf/2309.15807 .................... 16

*How Meta Uses Information for Generative AI Models and Features*, META (Aug. 20, 2026), https://www.facebook.com/privacy/genai .................... 16

Instagram Terms of Use, https://help.instagram.com/581066165581870/ .................... 21, 22, 23

Mass. Division of Banks, Money transmitter licensee list (as of Sept. 30, 2026), https://www.mass.gov//a-list-of-approved-licensees#licensees-approved-by-the-division-of-banks-in-microsoft-excel-format-as-of-march-31,-2026- .................... 7

Meta Platforms, Inc., Annual Report (Jan. 29, 2026), https://www.sec.gov/Archives/edgar/data/1326801/000162828026003942/meta-20251231.htm .................... 7

Meta Privacy Center, https://www.facebook.com/privacy/center .................... 23

Meta Privacy Policy, https://www.facebook.com/privacy/policy/ .................... 23, 24

Meta Terms of Service, https://www.facebook.com/terms/ .................... 21, 22, 23

Meta, *Your Public Information*, https://www.facebook.com/privacy/dialog/your-public-content-genai .................... 24

Nicholas Carlini et al., *Extracting Training Data from Diffusion Models*, ARXIV (Jan. 30, 2023), https://arxiv.org/pdf/2301.13188 .................... 18

Tex. Dep't of Banking, Entity Search: Meta Payments, https://www.dob.texas.gov/entity-search/entity-detail?bid=10346&eid=26&bn=0 .................... 7

U.S. Patent Pub. No. 2026/0142974 .................... 14

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant Meta Platforms, Inc. ("Meta") moves to dismiss the Complaint.

## INTRODUCTION

Plaintiffs' claims arise from photos they or their parents posted on public Facebook and Instagram accounts. Plaintiffs speculate that Meta used their specific photos—out of the countless public photos posted on Meta's services by its 3 billion monthly active users—to train (1) a facial recognition feature (which they call "NameTag") that Plaintiffs admit was never launched and that their own sources show would have, if launched, relied on pre-existing facial-recognition models, not a new, Meta-created model, and (2) image recognition and generation artificial intelligence models ("GenAI"). On that theory, Plaintiffs claim Meta violated Sections 15(a) and (b) of the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq.*, California's statutory and common-law right of publicity, and the California Constitution. Plaintiffs' claims contort BIPA and California law and should be dismissed.

The BIPA claims fail on multiple grounds. At the threshold, Section 25(c) exempts from BIPA any "financial institution" regulated under the Gramm-Leach-Bliley Act ("GLBA") and its "affiliate[s]." 740 ILCS 14/25(c). Because Meta Payments Inc.—a subsidiary and thus an affiliate of Meta—is a GLBA-regulated financial institution, Meta is exempt under Section 25(c).

Even if BIPA applied to Meta, Plaintiffs' claims still would fail. As to the hypothetical "NameTag" feature, Plaintiffs offer no facts suggesting that, out of the countless photos posted to Facebook and Instagram, Meta used the images of the two Illinois Plaintiffs in particular to train a supposed facial-recognition model for a never-operationalized "NameTag" feature. Dkt. 1 ¶¶ 67, 71. In addition, the documents incorporated into the Complaint—upon which Plaintiffs' "NameTag" allegations rest—make clear that Meta did not build or train *any* facial-recognition model to power "NameTag," nor did it create a database of faceprints to support such a feature.

But even if Meta had used their photos in this way, Plaintiffs do not allege that such data would have been capable of identifying F.M.A., who does not have a Facebook or Instagram account. *See Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1123-25 (9th Cir. 2024).

As to the GenAI models, Plaintiffs likewise plead no facts suggesting Meta trained those models on their facial images in particular, or that anyone ever submitted their photographs to the models as a prompt. And Plaintiffs offer no facts indicating that Meta transformed photographs—which BIPA excludes from the definition of "biometric identifier," 740 ILCS 14/10—into BIPA-covered biometric identifiers or biometric information.

Plaintiffs' California claims fare no better. The "right of publicity" claims fail because, as noted, Plaintiffs do not plausibly allege that Meta used their particular names or likenesses. In any event, Plaintiffs consented to use of their names and likenesses when they agreed to Meta's Terms of Service and accompanying policies, which expressly provide that such information may be used to develop Meta's products and technologies. Regardless, Plaintiffs do not allege the commercial appropriation of their identities—i.e., the placement of their names or images on a product or advertisement—a necessary element of a right of publicity claim. The California constitutional privacy claim likewise fails because Plaintiffs consented to Meta's alleged use of their facial images and therefore lack any reasonable expectation of privacy; moreover, that alleged conduct neither implicated a legally protected privacy interest nor effected a serious invasion of privacy.

At bottom, Plaintiffs seek to litigate generalized objections to potential uses of AI under ill-fitting state laws that do not reach the conduct they allege. The Complaint should be dismissed.

## FACTUAL BACKGROUND

Meta offers a variety of services used by billions of people worldwide. These services allow users to make online connections and post content, either publicly or privately. Meta's subsidiary, Meta Payments Inc., allows users to make transactions through Messenger peer-to-peer

money transfers, among other things.

Plaintiffs Francisco Alvarez and his minor son F.M.A. live in Illinois; Plaintiffs Jeremy Wahl and his minor daughter I.W. live in California. Dkt. 1 ¶¶ 47-48, 55-56. Alvarez and Wahl allege they posted photos of themselves and their families to their public Facebook and Instagram accounts. *Id.* ¶¶ 49-52, 57-62. F.M.A. does not have his own account, and the Complaint alleges only that his non-party mother posted one photo of him on Instagram. *Id.* ¶ 53.

Plaintiffs allege "[u]pon information and belief" that Meta used images of their faces posted to these public Facebook and Instagram pages to train two different types of AI models: (1) a facial-recognition model that purportedly could have powered a never-activated "NameTag" feature for Meta's smart glasses, *id.* ¶¶ 21, 45, 95; and (2) GenAI models (namely, Emu and Muse Image) that allow users to "create new content" in response to a user's prompt, *id.* ¶¶ 30-31, 63, 120. Plaintiffs do not, however, allege *how* Meta allegedly trained these models. *Id.* ¶ 67. Rather, their theory appears to be that, because Meta has used *some* public Facebook and Instagram content to train *some* AI models, Meta must have used *their* particular images—out of all photos posted by Facebook's "3.07 billion" and Instagram's "2.8 billion" monthly users and all the photos publicly available on the internet—to develop *these* models in particular. *Id.* ¶¶ 68-71, 106.

Plaintiffs concede that the "NameTag" feature was never activated, meaning Meta's smart glasses have never been used to identify anyone. *Id.* ¶¶ 21, 45, 95. And the sources incorporated into the Complaint, *e.g.*, *id.* ¶¶ 90-91 & n.33, further show that Meta did not create or test *any* facial-recognition model to power "NameTag," nor create a database of faceprints to support it. Rather, the sources show that Meta tested a potential "NameTag" feature on publicly available,

*pre-trained* models created by other researchers and shared widely online.[1]

Plaintiffs nevertheless speculate "[u]pon information and belief" that Meta transformed their ordinary photographs—which, as noted, are not covered by BIPA—into BIPA-protected "biometric identifiers" capable of identifying them. *Id.* ¶¶ 22, 95, 141. But as to "NameTag," Plaintiffs' incorporated sources again fail to support their conclusory allegation that Meta has a "collection of biometric identifiers and information in the form of faceprints on its servers" that it is "ready to use" *if* "NameTag" is ever activated. *Id.* ¶ 95.[2] And as to the GenAI models—which are not facial-recognition models—the Complaint alleges no facts supporting the jump from use of Plaintiffs' photographs to the creation of BIPA-protected faceprints.[3] Plaintiffs allege only that the GenAI models generate "numerical representations" of facial images, Dkt. 1 ¶¶ 141, 158, but do not allege facts showing that those "numerical representations" are BIPA-protected "face geometr[ies]." Even if Plaintiffs had done so, they still do not allege that those numerical representations are linked to their names or identities and thus capable of identifying them.

Nevertheless, based on these conclusory allegations, Plaintiffs claim that Meta violated BIPA, *id.* ¶¶ 205-219 (Counts I-II), California's statutory and common-law right of publicity, *id.* ¶¶ 220-241 (Counts III-IV), and the California Constitution, *id.* ¶¶ 242-258 (Count V).

---

[1] Buchodi, *Meta's Smart Glasses Companion App Ships a Complete, Dormant Face-Recognition Pipeline on a Stock Account* (June 4, 2026), https://www.buchodi.com/meta-glasses-facial-recognition/ (Ex. A).

[2] *See* Dhruv Mehrotra & Dell Cameron, *Meta Silently Added Face-Recognition Code for Its Smart Glasses to Millions of Phones*, WIRED (June 4, 2026) ("WIRED Article"), https://www.wired.com/story/meta-smart-glasses-face-recognition-nametag-connections/ (Ex. B) (cited at Dkt. 1 ¶¶ 20, 90 & nn.5, 33).

[3] Meta's AI Terms of Service disclose that Meta AI "transforms images … that you provide into an embedding," which may be used "to generate images or videos that may look or sound similar to you," while explaining that "[t]his technology is not facial or voice recognition," and that "[t]he embedding, which cannot be used to identify you, will be deleted within just a few seconds of its creation." AI Disclosures, https://www.facebook.com/legal/meta-AI-disclosures (Ex. C).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must state a claim that is "plausible" on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Because that standard demands "more than a sheer possibility that a defendant has acted unlawfully," a complaint must plead facts that are more than "'merely consistent with' a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). In assessing plausibility, only "well-pleaded factual allegation[s]" are "entitled to a presumption of truth." *Roake v. Forest Pres. Dist. of Cook Cnty.*, 849 F.3d 342, 347 n.4 (7th Cir. 2017). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted).

Under the incorporation-by-reference doctrine, a court may consider "documents attached to a motion to dismiss when they are referenced in the complaint and central to the plaintiff's claim." *Lax v. Mayorkas*, 20 F.4th 1178, 1181 n.1 (7th Cir. 2021); *see, e.g.*, *Castaneda v. Amazon.com, Inc.*, 679 F. Supp. 3d 739, 745 n.1 (N.D. Ill. 2023) (webpages cited in complaint); *Hogan v. Amazon.com, Inc.*, 2022 WL 952763, at *3 (N.D. Ill. Mar. 30, 2022) (Conditions of Use linked in Terms of Use cited in complaint). In addition, a court may take judicial notice of "matters of public record when the accuracy of those documents reasonably cannot be questioned," *Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 457 (7th Cir. 2017), including where undisputed material is hosted on a party's public website, *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 944 n.3 (7th Cir. 2010).

## ARGUMENT

### I. PLAINTIFFS' BIPA CLAIMS FAIL

Plaintiffs' BIPA claims fail at the threshold because Section 25(c) exempts Meta from the Act. Even if Meta were subject to BIPA, the claims would still fail because Plaintiffs do not plausibly allege that Meta (1) trained any AI models on the Illinois Plaintiffs' specific facial images

or (2) extracted a BIPA-protected "biometric identifier" in the process. On top of those cross-cutting flaws, Plaintiffs' Section 15(a) claim fails for lack of standing.

### A. Meta Is Not Subject To BIPA Because It Is Exempt Under Section 25(c)

Plaintiffs have no viable BIPA claims because, as an "affiliate" of a GLBA-regulated "financial institution," Meta is exempt from BIPA. Section 25(c) of BIPA provides: "Nothing in this Act shall be deemed to apply in any manner to a financial institution or an affiliate of a financial institution that is subject to" GLBA regulation. 740 ILCS 14/25(c). BIPA borrows the GLBA's definitions of "financial institution" and "affiliate," under which any entity that controls an institution significantly engaged in financial activities is considered an "affiliate of a financial institution." *See Cisneros v. Nuance Commc'ns, Inc.*, 189 F.4th 621, 624-25 (7th Cir. 2026).

Each Section 25(c) criterion is met here. Meta is the parent (*i.e.*, an "affiliate") of Meta Payments Inc., which qualifies as a "financial institution" under the GLBA with respect to its licensed products and services that are subject to the GLBA. As a result, Meta is categorically exempt from BIPA, requiring dismissal of Plaintiffs' BIPA claims on this ground alone.

***Meta Payments Inc. is a financial institution.*** The GLBA defines "financial institution" to mean "any institution the business of which is engaging in financial activities as described in section 1843(k) of Title 12." 15 U.S.C. § 6809(3)(A). This term extends beyond traditional financial institutions to include, for example, schools and technology companies involved in "[l]ending, exchanging, transferring, investing for others, or safeguarding money or securities." 12 U.S.C. § 1843(k)(4)(A); *see Duerr v. Bradley Univ.*, 590 F. Supp. 3d 1160, 1164, 1171 (C.D. Ill. 2022) (private university); *McGoveran v. Amazon Web Servs., Inc.*, 175 F.4th 434, 439 (3d Cir. 2026) (authentication services provider).

Judicially noticeable public records show that Meta Payments Inc. is registered in most

states to transmit money.[4] Meta's 2025 Form 10-K confirms that "[s]everal of our products offer Payments functionality," including the ability to "send money to other users," and that "[w]e are subject to" laws "governing … money transmission." Meta Platforms, Inc., Annual Report ("2025 Form 10-K") 42 (Jan. 29, 2026), https://www.sec.gov/Archives/edgar/data/1326801/000162828026003942/meta-20251231.htm. Because Meta Payments Inc. is "significantly engaged" in financial activities, it is a "financial institution" under the GLBA and thus for purposes of Section 25(c). *See* 16 C.F.R. § 313.3(k)(1) (defining "financial institution" to include those "significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities"); *see also Duerr*, 590 F. Supp. 3d at 1171 (dismissing BIPA claims where, as here, defendant demonstrated Section 25(c) defense using documents subject to judicial notice); *Doe v. Northwestern Univ.*, 586 F. Supp. 3d 841, 843-44 (N.D. Ill. 2022) (same).

***Meta is an affiliate of Meta Payments Inc.*** As noted, "Section 25(c) applies not only to 'financial institution[s]' but to 'affiliate[s] of a financial institution' as well." *Duerr*, 590 F. Supp. 3d at 1169 (quoting 740 ILCS 14/25(c)). The GLBA defines "affiliate" to mean "any company *that controls*, is controlled by, or is under common control with another company." 15 U.S.C. § 6809(6) (emphasis added). As the parent of Meta Payments Inc., *see* 2025 Form 10-K at 140, Meta is "an affiliate of a financial institution that is subject to" the GLBA. 740 ILCS 14/25(c).

---

[4] *See* Mass. Division of Banks, Money Transmitter Licensee List (as of Sept. 30, 2026), https://www.mass.gov/lists/download-a-list-of-approved-licensees#licensees-approved-by-the-division-of-banks-in-microsoft-excel-format-as-of-march-31,-2026-; Tex. Dep't of Banking, Entity Search: Meta Payments, https://www.dob.texas.gov/entity-search/entity-detail?bid=10346&eid=26&bn=0 (showing "[d]ate [o]pened" in 2012); Cal. Dep't of Bus. Oversight, Directory of Money Transmitters (captured July 25, 2013), https://web.archive.org/web/20130725001426/http://www.dbo.ca.gov/Licensees/money_transmitters/money_transmitters_directory.asp. Meta Payments Inc. was formerly known as Facebook Payments, Inc. *See, e.g.*, Articles of Amendment Filed with Fla. Div. of Corps., Doc. No. P10000100169 (July 2022), https://search.sunbiz.org/Inquiry/CorporationSearch/ConvertTiffToPDF?storagePath=COR%5C2022%5C0718%5C90966668.Tif&documentNumber=P10000100169 (reflecting name change).

***Dismissal is the proper remedy.*** Section 25(c) is categorical, providing that BIPA does not apply "in any manner" to a GLBA-regulated financial institution or its affiliate. 740 ILCS 14/25(c). That categorical language mandates dismissal regardless of whether there is a connection between the defendant's (or its affiliate's) GLBA-regulated activity, on the one hand, and the defendant's alleged BIPA violation, on the other. *See, e.g.*, *Harvey v. Resurrection Univ.*, 2022 WL 3716213, at *4-5 (N.D. Ill. Aug. 29, 2022) (rejecting plaintiff's argument that Section 25(c) could not apply because defendant's GLBA-regulated activities of extending and administering student loans were not linked to its alleged BIPA violations of using facial recognition technology on students taking online exams, and reasoning that "Section 25(c)'s plain language is clear: 'Nothing in this Act shall be deemed to apply in any manner to a financial institution'" (quoting 740 ILCS 14/25(c))); *Powell v. DePaul Univ.*, 2022 WL 16715887, at *3 (N.D. Ill. Nov. 4, 2022) (applying Section 25(c) even absent nexus); *Duerr*, 590 F. Supp. 3d at 1171 (similar); *Northwestern Univ.*, 586 F. Supp. 3d at 843 (similar).

The textual distinction between Section 25(c) and Section 25(e)'s government contractor exemption underscores the point. Section 25(e) states: "Nothing in this Act shall be construed to apply to a contractor, subcontractor, or agent of a State agency or local unit of government *when working for* that State agency or local unit of government." 740 ILCS 14/25(e) (emphasis added). In *Payton v. Union Pacific Railroad Co.*, -- F.4th --, 2026 WL 2936342 (7th Cir. Sept. 30, 2026), the Seventh Circuit held that, given its inclusion of the phrase "when working for," Section 25(e) does not apply simply where the defendant's alleged collection of biometric data occurred at the same time it had an active government contract, but only where the alleged collection occurred "in the course of" the defendant's work on the contract. *Id.* at *1-3 (citation omitted).

Unlike Section 25(e), Section 25(c) does not include the phrase "when working for" or

similar language requiring some link between the defendant's (or its affiliate's) GLBA-regulated activities, on the one hand, and the defendant's alleged BIPA violations, on the other. Given the distinction between Section 25(c)'s broad "in any manner" language and Section 25(e)'s narrow "when working for" language, it necessarily follows—as *Harvey* and the other above-cited decisions illustrate—that Meta need not establish a link between its alleged BIPA violations and Meta Payments Inc.'s GLBA-regulated activities to fall within Section 25(c). *See Chi. Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of Chi.*, 963 N.E.2d 918, 925 (Ill. 2012) ("When the legislature includes particular language in one section of a statute but omits it in another section of the same statute, courts presume that the legislature acted intentionally and purposely in the inclusion or exclusion, and that the legislature intended different meanings and results." (citation omitted)); *see also Johnson v. Amazon.com Servs. LLC*, 177 F.4th 904, 908 (7th Cir. 2026) (similar in interpreting Illinois statute); *Badgerow v. Walters*, 596 U.S. 1, 11 (2022) (similar).

In sum, because Meta is an "affiliate" of a GLBA-regulated financial institution, BIPA cannot apply to it "in any manner," warranting dismissal of Plaintiffs' BIPA claims. 740 ILCS 14/25(c); *see Cisneros*, 189 F.4th at 625 (dismissal based on Section 25(c)); *McGoveran*, 175 F.4th at 439-40 (same); *Duerr*, 590 F. Supp. 3d at 1171 (same); *Northwestern Univ.*, 586 F. Supp. 3d at 843-44 (same); *Powell*, 2022 WL 16715887, at *3-4 (same).

### B. Plaintiffs Do Not Plead Facts Plausibly Alleging Meta Collected Or Possessed Their Biometric Identifiers

Even if BIPA applied to Meta, Plaintiffs' BIPA claims still would fail because they do not plausibly allege Meta collected or possessed the Illinois Plaintiffs' "biometric identifier[s]"—defined to include a "scan of … face geometry," but not "photographs"—or "[b]iometric information," meaning "information … based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10; *see Zellmer*, 104 F.4th at 1123-25 (like biometric

information, "'biometric identifiers' under BIPA must be able to identify" the person).[5] As an initial matter, the Complaint does not plausibly allege that, out of the countless images available to Meta—and even assuming it trained or operated the GenAI or supposed "NameTag" models on *any* images—Meta did so on images of the two Illinois Plaintiffs in particular. This alone defeats Plaintiffs' BIPA claims. *See Hogan*, 2022 WL 952763, at *7 (dismissal where plaintiffs did "not plead facts to show that their images were specifically used"). Plaintiffs' "NameTag" allegations further fail because the Complaint's incorporated sources in fact show that Meta did not (1) develop or train a facial-recognition model to power "NameTag," as opposed to relying on already existing open-source facial-recognition models; or (2) maintain a database of faceprints for this never-activated feature. And Plaintiffs' GenAI allegations further fail because they do not plausibly allege that (1) Meta transformed any training images into BIPA-protected "biometric identifiers," or (2) the models—which were designed to generate new images, not identify people from existing images—were capable of identifying them.

### 1. Plaintiffs Do Not Plausibly Allege That Meta Collected Or Possessed *Their* Images Or Biometric Data To Train Or Operate A "NameTag" Feature

Plaintiffs' first theory is that Meta violated BIPA in the context of what they call the "NameTag" feature of the Meta Glasses product. Meta, they say, has been "considering incorporating facial-recognition technology into its smart glasses" to allow users to "recogniz[e] people a user knows because they are connected on a Meta platform" or "identify[] people whom the user may not know but who have a public account on a Meta site like Instagram." Dkt. 1 ¶¶ 76,

[5] In an apparent drafting error, Plaintiffs assert BIPA claims on behalf of minor I.W., who lives in California, but not minor F.M.A., who lives in Illinois. Dkt. 1 at 51, 53 ("Claim 1" and "Claim 2" headers). Meta addresses F.M.A.'s BIPA claims that Plaintiffs likely meant to assert. I.W. cannot invoke BIPA because Plaintiffs do not allege any connection between the alleged collection of her information and Illinois, *Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 959 (N.D. Ill. 2024), and her BIPA claims would also fail for the other reasons set forth herein.

81, 96. Plaintiffs admit that Meta has not "activated" any such technology. *Id.* ¶¶ 21, 45, 95. Nevertheless, they assert "[u]pon information and belief" that Meta used the Illinois Plaintiffs' photographs from Facebook and Instagram (i) to develop and train a facial-recognition model that could, if activated, provide a "NameTag" service, and (ii) to create and store, on Meta's servers, a collection of "faceprints" for the model to match against. *Id.* ¶¶ 24, 63, 95, 106, 165-166.

That theory fails for three independent reasons. First, Plaintiffs do not plausibly allege that Meta used *their* specific facial images to train a facial-recognition model for "NameTag" or to create a faceprints database for "NameTag." Second, the incorporated sources the Complaint cites for its "NameTag" allegations (i) indicate that Meta did not develop or train *any* facial-recognition model to power the not-activated "NameTag" service and (ii) do not support the allegation that Meta created a "database" of "faceprints" for use in connection with such a service. Third, F.M.A.'s claims fail because Plaintiffs allege that "NameTag" would have identified people through Facebook or Instagram accounts, which he is not alleged to have.

***Plaintiffs do not plausibly allege Meta used their particular facial images***. The BIPA claims fail at the outset because, even assuming Meta trained a facial-recognition model or created a faceprint database to support "NameTag" (*but see infra* at 12-14), Plaintiffs do not plausibly allege that Meta used *their* facial images to do so. In *Hogan*, the court dismissed BIPA claims where the plaintiffs did "not plead facts to show that their images were specifically used to better the [facial-recognition] technology or make it more marketable." 2022 WL 952763, at *7. Plaintiffs' BIPA claims here should be dismissed for the same reason.

Plaintiffs concede they do not actually know "*which* Facebook and Instagram images [Meta]" allegedly used in the context of the not-activated "NameTag" service, Dkt. 1 ¶ 67 (emphasis added), nor do they posit how many Facebook or Instagram images were allegedly used

for that purpose. That is, Plaintiffs offer no facts to support (or even reason to think) Meta used images of *their* faces among the countless images Facebook's "3.07 billion monthly users" and Instagram's "2.8 billion monthly users" post on their accounts. *Id.* ¶ 71; *see Strautins v. Trustwave Holdings, Inc.*, 27 F. Supp. 3d 871, 880-81 (N.D. Ill. 2014) (rejecting plaintiff's speculative theory that some "hacker (or hackers) obtained *her* data" based solely on an allegation that the hacker had "gained some access to a … database" containing plaintiff's data). Given the vast number of images available on Facebook and Instagram and in third-party datasets, the odds that the two Illinois Plaintiffs' facial images in particular were used are infinitesimal. *See In re Google Generative AI Copyright Litig.*, 809 F. Supp. 3d 903, 914 (N.D. Cal. 2025) (dismissing copyright claim where plaintiffs failed to plausibly allege their works were included in training datasets).

Ultimately, there is nothing to separate Plaintiffs from anyone who has had their photo posted on Facebook or Instagram, and certainly nothing to "nudge[] … across the line from conceivable to plausible" their allegation that Meta used *their* facial images to train a "NameTag" model. *Twombly*, 550 U.S. at 570. It follows that Plaintiffs cannot state a BIPA claim under their "NameTag" theory. *See In re Mosaic LLM Litig.*, 2025 WL 2402677, at *2 (N.D. Cal. Aug. 19, 2025) (dismissing copyright claim where plaintiffs "d[id] not allege facts that could establish that the [challenged] models are actually trained on any shadow library websites, let alone those that contain [their] works"); *Strautins*, 27 F. Supp. 3d at 879-81 (dismissing privacy claim where "some tax filers may have been affected while others were not, and [plaintiff's] complaint lack[ed] any allegations to plausibly place her into the former group rather than the latter").

***Plaintiffs fail to allege Meta developed a facial-recognition model for "NameTag" or created an associated collection of "faceprints."*** Plaintiffs' "NameTag" theory separately fails because the Complaint does not plausibly allege Meta used any photographs—let alone

Plaintiffs'—to develop and train a facial-recognition model to power a "NameTag" service, or that it stored a collection of "faceprints" for that system to match against.

As an initial matter, the WIRED article (Ex. B) on which the Complaint relies (and thus incorporates by reference) affirmatively undermines Plaintiffs' tenuous claim that Meta has readied the not-activated "NameTag" service using facial images from Facebook and Instagram. *See* Dkt. 1 ¶¶ 90-91 & n.33. The article cites the report (Ex. A) of a security researcher named Buchodi,[6] who wrote that the three AI models that would allegedly power the "NameTag" feature—if activated—are "open-source architectures" from "the same model families that other apps and academic projects already use." In other words, the models Meta allegedly used to test "NameTag" are freely available pre-existing tools built and trained by *others*.

That fatally contradicts Plaintiffs' conclusory assertions that Meta developed or trained a "facial-recognition model" for use in a "NameTag" feature and deployed "images of people's Facebook and Instagram" for such purpose. Dkt. 1 ¶ 106. Indeed, their only support for the use of *any* Facebook and Instagram photos in developing a "NameTag" model is the allegation that "Meta has … us[ed] images from Facebook and Instagram to train its various AI models." *Id.* ¶ 68. But bare speculation that Meta has adopted a similar approach in the past and so likely has again here, *id.* ¶¶ 68, 106, cannot satisfy Rule 8(a), especially given that the incorporated sources show that Meta did not train its own model at all. *See Atkins v. City of Chicago*, 631 F.3d 823, 831-32 (7th Cir. 2011) (allegations that "could be true" are not "enough to save [a complaint]").

Nor do Plaintiffs allege facts to support their theory that Meta had a collection of "faceprints" on its servers that "it is ready to use for facial recognition via NameTag." Dkt. 1 ¶ 95.

---

[6] Like the article itself, Buchodi's report—upon which the article extensively relies—is incorporated by reference. *See Hogan*, 2022 WL 952763, at *3; *supra* at 5.

Again, the WIRED article states only that, *if* a "NameTag" feature were ever "activated" on Meta Glasses, it could "transform faces captured by Meta's glasses into … faceprints[] and check each one against faceprints stored on the user's phone." *Id.* ¶ 94. The article itself (Ex. B) undermines any claim that a "database" of "faceprints" is already "stored on the user's phone" or on Meta's servers: Because "[o]nly traces of the user interface are currently present," the authors explain, "[i]t remains unclear whose faces will be included in the system's recognition database, how those profiles are created, or how many people could ultimately be identifiable through [NameTag]." And the allegation that the phone app contains a "database that's currently *configured* to receive updates from Meta," Dkt. 1 ¶ 94 (emphasis added), shows at most that such a database *could* receive updates someday—not that any have been received, let alone that Meta has already collected faceprints for that purpose from photos posted on Instagram and Facebook.

In a final attempt to bring the not-activated "NameTag" system to life, Plaintiffs reference a May 2026 patent application that, they say, provides a "technical blueprint for … the *type* of facial-recognition system that reports have described as 'NameTag.'" *Id.* ¶ 103 (emphasis added); *see id.* ¶¶ 99-105. But the patent has nothing to do with "NameTag." Instead, it describes a mechanism for users to prove that an account is theirs by comparing a self-generated photo to their account picture. U.S. Patent Pub. No. 2026/0142974 ¶¶ [0045]–[0046], [0054]–[0055] (Ex. D). This application says nothing about identifying strangers through smart glasses.

***Minor F.M.A. has no viable BIPA claims.*** Regardless, minor F.M.A.'s BIPA claims should be dismissed because the Complaint does not plausibly allege that Meta transformed any facial image of him into a BIPA-protected biometric identifier capable of identifying him.

The premise of Plaintiffs' "NameTag" theory is that Meta transformed their photographs into "faceprints," which a facial-recognition model installed on Meta Glasses could use to identify

them using their Facebook and Instagram accounts. Dkt. 1 ¶¶ 23, 96. But Plaintiffs do not allege that F.M.A. has a Facebook or Instagram account, or that the single posted photo of him is otherwise linked to his identity. *Id.* ¶¶ 49-60. And settled law holds that "'biometric identifiers' under BIPA must be able to identify," *Zellmer*, 104 F.4th at 1123-25—that is, to "'prove the identity of (a person or thing),'" *Martell v. X Corp*., 2024 WL 3011353, at *3 (N.D. Ill. June 13, 2024) (citation omitted); *see Javid v. M.A.C. Cosms., Inc.*, 2026 WL 1601454, at *2 (N.D. Ill. June 4, 2026) (collecting cases). In *Zellmer*, the Ninth Circuit rejected the BIPA claims of a plaintiff who never used Facebook because, without a Facebook account to match against, Meta could not identify him using the "face signature" it allegedly created. 104 F.4th at 1120-21, 1125-26. The same holds here: Without an allegation that the single photo of F.M.A. on his mother's Instagram account is linked to his identity, a "faceprint" of him could not "identif[y] [F.M.A.] by name," as BIPA requires. *Javid*, 2026 WL 1601454, at *5; *see G.T. v. Samsung Elecs. Am., Inc.*, 742 F. Supp. 3d 788, 800 (N.D. Ill. 2024), *aff'd*, 186 F.4th 470 (7th Cir. 2026).

### 2. Plaintiffs Do Not Plausibly Allege Meta Collected Or Possessed Their Biometric Identifiers To Train Or Operate Its GenAI Models

Plaintiffs' second theory is that Meta violates BIPA through its "text-to-image [Gen]AI models"—Emu and Muse Image—which are designed to "take[] a written description as input and generate[] a new image that matches the content of that description." Dkt. 1 ¶¶ 119-120. Like their "NameTag" theory, the GenAI theory fails because Plaintiffs do not plausibly allege that *their* facial images were used either to train Meta's GenAI models or as part of prompts for generating new images. And even if they had, Plaintiffs do not plausibly allege Meta transformed their facial images into BIPA-protected "biometric identifiers" capable of identifying them.

***Plaintiffs fail to allege Meta used their particular facial images***. Plaintiffs allege "[u]pon information and belief" that Meta used "images of … [their] faces" to (1) "create an output from

one of Meta's [GenAI] models … through a user submitting the image via prompt as an input … during the inference stage" or (2) "train Meta's [GenAI] models." *Id.* ¶ 63. But they allege no fact suggesting that anyone submitted either Illinois Plaintiff's facial image as a "prompt" to Emu or Muse. *Id.* ¶¶ 128-130, 158-163. That a user *might* "take their picture and use it to create a new AI image," *id.* ¶ 129, does not state a BIPA claim. *See G.T.*, 186 F.4th at 477 (that a company "may collect" plaintiff's biometric data does not state a BIPA claim unless plaintiff alleges that "the facial geometry data in question are actually gathered and saved" by the company); *Jacobs v. Hanwha Techwin Am., Inc.*, 2021 WL 3172967, at *3 (N.D. Ill. July 27, 2021) (similar).

Plaintiffs' allegation that their photos were included in Emu or Muse's training data fares no better. Plaintiffs rely on a research paper stating that Meta "curate[d] a large internal pre-training dataset consisting of 1.1 billion images to train" Emu. Xiaoliang Dai et al., *Emu: Enhancing Image Generation Models Using Photogenic Needles in a Haystack* 1-2, 5, ARXIV (Sept. 27, 2023), https://arxiv.org/pdf/2309.15807 (cited at Dkt. 1 ¶¶ 123, 125 & nn.47-48) (Ex. E). But the Complaint does not identify where those images came from, much less that all or most of them were pulled from public profiles on Facebook or Instagram. The allegations as to Muse are even more sparse, as Plaintiffs concede they do not know "how many … image-text pairs [Meta] has used to train" that model. Dkt. 1 ¶ 135. That Meta has itself described its GenAI models as "trained by looking at billions of images and their text captions," *id.*, does not establish that Meta used Plaintiffs' images, either. As Meta has confirmed, "a combination of sources are used for training[,] including" "[i]nformation that is available on the internet," "information from products and services built by external developers," and "[i]nformation shared on Meta products."[7]

[7] *How Meta Uses Information for Generative AI Models and Features*, META (Aug. 20, 2026), https://www.facebook.com/privacy/genai/ (cited at Dkt. 1 ¶¶ 135-138 & nn.55-58, and thus incorporated by reference) (Ex. F).

Given the countless images available online, in other AI models, and across billions of Facebook and Instagram profiles, Plaintiffs do not plausibly allege that Meta used images of *their* particular faces to train Muse or Emu. Plaintiffs thus fail to allege any facts to nudge their GenAI-related allegations across the line from conceivable to plausible. *See Hogan*, 2022 WL 952763, at *7; *In re Google Generative AI Copyright Litig.*, 809 F. Supp. 3d at 914.

***Plaintiffs fail to allege that Meta transformed their photographs into biometric identifiers***. Even if Plaintiffs had plausibly alleged that their particular facial images were used, they do not (as they must) allege facts indicating that Meta transformed their photos into BIPA-protected "biometric identifiers" capable of identifying them. At most, Plaintiffs allege (without support) that, "when a training image contains a person's face, the model analyzes the person's facial features and generates numerical representations of the analyzed face" that the model then "memorize[s]." Dkt. 1 ¶¶ 141, 148. The same, they say, is true "[w]hen a user submits an image of a person to one of Meta's publicly available GenAI models as part of a prompt." *Id.* ¶ 158.

These conclusory allegations, even if accepted, do not plead the creation of a BIPA-protected "biometric identifier." Plaintiffs allege that any data retained by Meta's GenAI models is "stored in compressed latent form" as "numerical representations"—that is, as strings of numbers. *Id.* ¶¶ 153-154. But "a string of numbers that represents a particular image of a face" is not a BIPA-protected "face geometry" because it "do[es] not—and cannot—reveal information about a face's geometric information" and "[n]o one—not even [Meta]—can reverse-engineer th[ose] numbers … to derive information about a person." *Zellmer*, 104 F.4th at 1120-21. Nor do Plaintiffs allege that Meta links those numerical representations to any names or other personally identifying information. That too is fatal, as BIPA requires "a biology-based set of measurements … that can be used to identify a person." *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1094 (N.D.

Ill. 2017). Mere numerical data derived from an image of a face that cannot be linked to the identity of the person to whom the face belongs is insufficient. *See Zellmer*, 104 F.4th at 1125.

Recognizing that problem, Plaintiffs assert in an entirely conclusory manner that "numerical representations" of a facial image constitute a "scan of face geometry" that can be used to "identify[] the depicted person." Dkt. 1 ¶¶ 156, 161. But they plead no facts explaining how—or why—any numerical representations allegedly created from an image including their faces would be a BIPA-protected "face geometry" capable of identifying them. At most, Plaintiffs reference material from Meta's Privacy Center for the notion that training data for some Meta AI models "*may* include personal information," such as the "name and contact information" of a public "blog's" author or "[i]nformation shared on Meta Products" like "posts or photos and their captions." *Id.* ¶¶ 136-137. But Plaintiffs do not allege that Meta collected or stored any identifying information about Facebook and Instagram users alongside the numerical data it allegedly encodes in its GenAI models.[8] *See Ji v. Naver Corp.*, 2023 WL 6466211, at *12 (N.D. Cal. Oct. 3, 2023) (dismissing BIPA claim where plaintiffs did not plausibly allege defendants could link plaintiffs' names or emails to their face scans). Nor do Plaintiffs allege that any of their images carried information identifying them by name. These allegations fall short of establishing that Meta created "face geometr[ies]" or that the numerical representations it did allegedly create are "capable of identifying" them, and thus are "insufficient to show that [Meta's data] constitutes

[8] Plaintiffs allege that a *different*, non-Meta-created "image-generation model" could replicate a specific person's image where the model had "memorize[d]" a caption identifying that person by name, but that does not bear on the data *Meta* collected or stored while training Emu or Muse. Dkt. 1 ¶ 148 & n.69 (referencing "Nicholas Carlini, et al., *Extracting Training Data from Diffusion Models* at 1, ARXIV (Jan. 30, 2023), https://arxiv.org/pdf/2301.13188"). And even if Plaintiffs had plausibly alleged the same of Meta's GenAI models, that would not suffice to allege that those models could "'prove the identity of (a person or thing)'"—let alone infer Plaintiffs' specific identity from the images and captions they posted. *Martell*, 2024 WL 3011353, at *3.

either a biometric identifier or biometric information." *G.T.*, 742 F. Supp. 3d at 801.

The implausibility of Plaintiffs' GenAI theory is further confirmed by the lack of any explanation for *why* Meta would collect or retain identifying data when training GenAI models to generate new images. In Plaintiffs' telling, the models "create realistic images by starting with random noise and gradually turning that noise into a picture while working with compressed representations." Dkt. 1 ¶ 122. In other words, the models are built to make *new* pictures, not to recognize anyone whose photo was used in that process. That Plaintiffs fail to allege why the models would use the images for recognition warrants dismissal. *See Mosley v. Gen. Revenue Corp.*, 2020 WL 4060767, at *4 (C.D. Ill. July 20, 2020) (dismissing TCPA claim where plaintiff failed to offer plausible reasons to make "the fact that the device used *might* have had the capability to use randomly generated number systems … more than a speculative possibility").

* * *

As the Seventh Circuit recently explained, although "technology companies" have "significantly more information about their proprietary systems and software than everyday consumers, who may not be able to ascertain their inner workings without the aid of discovery," the burden nevertheless "rests on Plaintiffs to plausibly state a cause of action that can withstand judicial scrutiny." *G.T.*, 186 F.4th at 477 (dismissing BIPA claim); *see also Watts v. Emergency Twenty Four, Inc.*, 2021 WL 2529613, at *4-5 (N.D. Ill. June 21, 2021) (dismissing TCPA claim on similar grounds). Without alleged facts making it plausible that Meta created BIPA-protected biometric identifiers capable of identifying the Illinois Plaintiffs, the BIPA claims fail.

### C. Plaintiffs Lack Article III Standing To Pursue Their Section 15(a) Claim

Plaintiffs' Section 15(a) claim separately fails on standing grounds. Section 15(a) requires private entities that possess covered biometric data to develop, publish, and comply with "a written policy, made available to the public, establishing a retention schedule and guidelines for

permanently destroying" biometric data "when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." 740 ILCS 14/15(a). But the duties to develop and disclose a retention schedule are duties "owed to the public generally" that, without more, do not create the kind of "particularized harm" required to support standing for a Section 15(a) claim. *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1154 (7th Cir. 2020) (citation omitted). Thus, to have standing, a plaintiff must allege "particularized harm that resulted from [Meta's] violation of section 15(a)." *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 626 (7th Cir. 2020).

Plaintiffs allege no such facts here. The Complaint asserts that "Meta did not properly develop or make publicly available a written" retention policy. Dkt. 1 ¶ 210. But that is precisely the kind of "mere procedural failure" insufficient to establish Section 15(a) standing. *Fox*, 980 F.3d at 1149. And while Plaintiffs also allege in passing that Meta "improperly retain[ed] the biometric data of Plaintiffs and Class Members," Dkt. 1 ¶ 211, that allegation "merely parrots the statutory language without making any specific factual allegations about retention," *Patterson v. Respondus, Inc.*, 593 F. Supp. 3d 783, 824 (N.D. Ill. 2022). Indeed, Plaintiffs do not even attempt to specify *when* Meta supposedly should have destroyed their allegedly retained data. *See* 740 ILCS 14/15(a). Thus, while "the unlawful retention of biometric data beyond the time limits set by section 15(a)" could theoretically establish standing, Plaintiffs' "entirely conclusory" allegation does not "establish[] Article III standing." *Patterson*, 593 F. Supp. 3d at 824.

## II. PLAINTIFFS' CALIFORNIA RIGHT OF PUBLICITY CLAIMS FAIL

Plaintiffs' California "right of publicity" claims fare no better. These causes of action prevent defendants from trading on another person's name or image for commercial gain and without consent—for example, by putting a celebrity's face on a product or advertisement to falsely imply their endorsement. Plaintiffs' allegations fail to state a claim for three independent

reasons. First, as explained, Plaintiffs do not plausibly allege that Meta used their identities (names or likenesses) at all. Second, Plaintiffs indisputably consented to Meta's alleged uses of their images. Third, Plaintiffs do not allege Meta "used" their identities in the relevant sense—that is, by exploiting the publicity associated with their particular identities to promote a product.

### A. Plaintiffs Do Not Plausibly Allege That Meta Used *Their* Identities

As with the BIPA claims, the California law claims (including the constitutional privacy claim, *see infra* at 27-30) fail because Plaintiffs do not plausibly allege Meta used *their* identities. "[B]oth the statutory and common law versions of a right of publicity claim require that the defendant actually use the plaintiff's likeness." *Perfect 10, Inc. v. Google, Inc*., 2010 WL 9479060, at *13 (C.D. Cal. July 30, 2010), *aff'd*, 653 F.3d 976 (9th Cir. 2011). As with the Illinois Plaintiffs, *see supra* at 10-12, 15-17, the California Plaintiffs lack any plausible allegations that Meta used their photos. "[A]ny right of publicity claims fail for this reason alone." *Cross v. Facebook, Inc*., 14 Cal. App. 5th 190, 210 (2017); *see Perfect 10*, 2010 WL 9479060, at *13.

### B. Plaintiffs Consented To Meta's Use Of Their Images

Plaintiffs' right of publicity claims independently fail because they consented to the very alleged uses of their identities they challenge. Consent precludes right of publicity claims. *See* Cal. Civ. Code § 3344(a); *Gionfriddo v. Major League Baseball*, 94 Cal. App. 4th 400, 409 (2001). And parental consent precludes claims on behalf of minors. *See* Cal. Civ. Code § 3344(a). Here, Plaintiffs expressly provided their consent when they created and posted images using their Facebook and Instagram accounts. That consent conclusively defeats their claims. *See Lightbourne v. Printroom Inc.*, 122 F. Supp. 3d 942, 945-48 (C.D. Cal. 2015).

To create and use an Instagram or Facebook account, a user must agree to Instagram's Terms of Use or Meta's Terms of Service, both of which have a California choice-of-law provision. *See Terms of Service* § 4.4 ("Meta Terms") (Ex. G), https://www.facebook.com/terms/;

*Terms of Use* § 7.4 ("Instagram Terms") (Ex. H), Instagram, https://help.instagram.com/581066165581870/.[9] Accordingly, "[t]he question of whether [Instagram or Facebook] users consented to the alleged conduct is" governed by California contract law, which presumes that users read the terms and policies to which they assent. *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 789 (N.D. Cal. 2019). Further, a contract incorporates other documents "so long as it guides the reader" to them and the incorporated document's terms are "easily available to the contracting parties." *Id.* at 791 (quoting *Shaw v. Regents of Univ. of Cal.*, 58 Cal. App. 4th 44, 54 (1997)).

Plaintiffs consented to Meta's use of their identities. The Meta and Instagram Terms provide that "when [users] share, post, or upload content," they "grant [Meta] a … license to host, use, distribute, modify, run, copy, … and create derivative works of [their] content." Ex. G (Meta Terms) § 3.3(2); *see* Ex. H (Instagram Terms) § 4.3.[10] "This means, for example, that if [users] share a photo on Facebook, [they] give [Meta] permission to store, copy, and share it with others … such as Meta Products or service providers." Ex. G (Meta Terms) § 3.3(2); *see* Ex. H (Instagram Terms) § 4.3 (license extends to "upload[ed] content … like photos"). The Meta Terms also explain that the license is granted "for the purposes of providing and improving [Meta's] Products and services as described in Section 1." Ex. G (Meta Terms) § 3.3(1). Section 1 states that Meta "use[s] and develop[s] advanced technologies—such as artificial intelligence, machine learning systems, and augmented reality," *id.* § 1.6, and "engage[s] in research to develop, test,

---

[9] The Complaint incorporates the Meta Terms by reference because they are "referenced in the complaint and central to the plaintiff[s'] claim." *Lax*, 20 F.4th at 1181 n.1; *see* Dkt. 1 ¶ 38 & n.13; *supra* at 5. The Instagram Terms are judicially noticeable as undisputed material that is hosted on a party's public website. *LaBella Winnetka*, 628 F.3d at 944 n.3.

[10] The excerpts from Meta's Terms and Instagram's Terms cited herein have not materially changed since September 2021, when the proposed class period began. Dkt. 1 ¶ 195.

and improve our Products," which "includes analyzing data we have about our users," *id.* § 1.7.

In addition, the Meta and Instagram Terms repeatedly state that Meta uses personal data as set forth in the linked Privacy Policy. Ex. G (Meta Terms), at "Overview," §§ 1.7, 2; Ex. H (Instagram Terms) § 3. The Privacy Policy explains that Meta collects user content like "photos and videos" to "[d]evelop," "improve," "[b]uild," and "test out new products and features." Privacy Policy, https://www.facebook.com/privacy/policy/ (Ex. I).[11] For U.S. users, the Privacy Policy also includes the U.S. Regional Privacy Notice ("Notice") (Ex. J).[12] The Notice states that Meta collects "[i]dentifiers," "[p]hotos[,] and videos, which may include face imagery," for "[p]roviding, personalizing, and improving our products" as well as "[r]esearching and innovating for social good." *Id.*

The Privacy Policy also links directly to the policies set forth in Meta's Privacy Center (Ex. K), https://www.facebook.com/privacy/center. As the Complaint observes, these policies state that Meta trains its GenAI models on "[i]nformation shared on Meta Products including things like posts or photos …, and [users'] interactions with features that are part of AI at Meta." Dkt. 1 ¶ 38. Plaintiffs acknowledge these disclosures, but assert they are "difficult to find." *Id.* But the interactive tile labeled "Generative AI / AI at Meta" is one of four tiles prominently displayed near the top of the Privacy Center. Ex. K (Privacy Center). Elsewhere, the Privacy Center reiterates that Meta "use[s] public information (including profile info, comments, and posts) on Meta Products to train generative AI models for these features …. [Meta doesn't] use information with

[11] The Complaint incorporates the Privacy Policy by reference for the same reasons as the Terms. *See supra* n.9; Dkt. 1 ¶¶ 38, 159. The Privacy Policy is also incorporated by reference via the Terms themselves. *See Shaw*, 58 Cal. App. 4th at 54. The excerpts from the Privacy Policy cited herein have not materially changed since September 2021, when the proposed class period began.

[12] The excerpts from the Notice cited herein have not materially changed since September 2021, when the proposed class period began.

an audience other than Public for these purposes." Ex. L (Your public information), https://www.facebook.com/privacy/dialog/your-public-content-genai.[13]

As the Northern District of California recently recognized, Meta's Terms and incorporated policies "create an express assent to the data use" they describe. *Robinson v. Meta Platforms, Inc.*, 2026 WL 2722540, at *4 (N.D. Cal. Sept. 15, 2026) (dismissing on consent grounds, and noting that consent under California law is distinct from BIPA's consent process). Here, that consent broadly encompasses a license for Meta to collect user content, including "[i]dentifiers" like "face imagery" in "[p]hotos and videos." Meta Terms § 3.3(2); Instagram Terms § 4.3; Ex. J (Notice). Users specifically consent to Meta using that content to "[d]evelop," "improve," and "test out new products and features." Ex. I (Privacy Policy); *see also* Meta Terms § 3.3(1). Like the plaintiff in *Robinson*, the adult Plaintiffs here provided that consent when they signed up for Facebook and Instagram accounts and uploaded public images. Dkt. 1 ¶¶ 49-54, 57-62; *see Robinson*, 2026 WL 2722540, at *3. They cannot now complain that Meta allegedly did what they consented to: "extract[ing] … information from … facial images," Dkt. 1 ¶ 225; *see* Ex. J (Notice), and using it "to train and improve" technology systems, Dkt. 1 ¶ 225; *see* Ex. I (Privacy Policy).

Equivalent consent was provided for the minor Plaintiffs as well. The Meta and Instagram Terms provide that users may upload only content that they own or have the right to share. Meta Terms § 3.2; Instagram Terms § 4.1. That includes content like photographs depicting other people. By uploading photos of their children, the adult account holders—F.M.A.'s mother and I.W.'s father (Plaintiff Wahl)—represented they had the right to share that content and consented to the Meta Terms as applied to those photos. *See id.*; Dkt. 1 ¶¶ 53, 59. That "consent of [a] parent

[13] This webpage is judicially noticeable as undisputed material that is hosted on a party's public website. *LaBella Winnetka*, 628 F.3d at 944 n.3.

or legal guardian" defeats a right of publicity claim for the minor Plaintiffs. Cal. Civ. Code § 3344(a). Because Plaintiffs consented to the alleged data use underlying their right of publicity claims, those claims should be dismissed. *See Robinson*, 2026 WL 2722540, at *4.

**C. Plaintiffs Do Not Plausibly Allege Commercial Appropriation**

Even if Plaintiffs had plausibly alleged their data was (i) used (ii) without their consent, their claims still fail because they do not allege the kind of use that violates a right of publicity.

A right of publicity claim requires that the alleged "use" rise to the level of commercial appropriation of an individual's identity. *See* Cal. Civ. Code § 3344(a); *Ambrozewicz v. 6Sense Insights, Inc.*, 804 F. Supp. 3d 1026, 1035 (N.D. Cal. 2025); *Cross*, 14 Cal. App. 5th at 208, 210. "[T]he right of publicity has developed to protect the commercial interest of celebrities in their identities. The theory of the right is that a celebrity's identity can be valuable in the promotion of products." *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1398 (9th Cir. 1992) (citation omitted); *see Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 824 (1979). "Although courts have recognized that right of publicity statutes can also protect non-celebrity identities, those cases have likewise concerned the sort of use that implicates the individual in question." *Ambrozewicz*, 804 F. Supp. 3d at 1035. As a result, "'[v]irtually all right of publicity cases involve the use of a person's name or likeness to advertise a separate product or service.'" *Id.* (citation omitted); *see In re Facebook, Inc.*, 402 F. Supp. 3d at 803 (describing "the type of conduct made unlawful" as "using a plaintiff's face or name to promote a product or service"); *Brooks v. Thomson Reuters Corp.*, 2021 WL 3621837, at *4 (N.D. Cal. Aug. 16, 2021) (collecting cases). That is why right of publicity claims accrue when the person's likeness "is first made publicly available." *Tseng v. PeopleConnect, Inc.*, 665 F. Supp. 3d 1136, 1144 (N.D. Cal. 2023).

By contrast, right of publicity claims fail when the plaintiff's information or identity is merely incorporated into a commercial product without being used to market the product itself.

*See Ambrozewicz*, 804 F. Supp. 3d at 1035 (dismissal of claim based on inclusion of plaintiffs' contact information in paid database); *Cross*, 14 Cal. App. 5th at 210-11 (dismissal of claims based on inclusion of plaintiffs' name and likeness on social media pages that displayed unrelated adjacent advertisements).[14] Thus, in a case addressing AI image-generation models, the court in *Andersen v. Stability AI Ltd.*, 700 F. Supp. 3d 853, 873 (N.D. Cal. 2023), dismissed statutory and common-law right of publicity claims because the artist-plaintiffs—who alleged that the defendant's models would output work in their style when prompted by name—failed to sufficiently allege that their names were used to advertise, sell, or solicit purchases of the models.

Plaintiffs' allegations are "nothing like the classic right of publicity case," which involves exploitation of "the value of [a] person's *individual* identity." *Ambrozewicz*, 804 F. Supp. 3d at 1035. Plaintiffs do not allege that Meta has "used" their individual identities in any sense ever recognized as affecting their right of publicity—for example, that their names or likenesses were used in advertisements for Meta's GenAI models. Indeed, as to "NameTag," Plaintiffs cannot allege any commercial benefit at all, as the product was never launched. Meta has not even allegedly appropriated the "publicity" associated with Plaintiffs' identities.

Instead, Plaintiffs suggest that Meta's unlawful appropriation was its use of their likenesses to develop AI technologies, which Meta then used for commercial purposes. Dkt. 1 ¶¶ 223-227, 234-238. But Plaintiffs fail to allege that Meta promotes its AI technologies by associating them with their individual identities. To the contrary, as they acknowledge, Meta's AI technologies are

---

[14] *See also, e.g.*, *Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1100-03 (7th Cir. 2022) (dismissing Illinois right of publicity claim based on inclusion of plaintiff's contact information in purchasable mailing list); *Vrdolyak v. Avvo, Inc.*, 206 F. Supp. 3d 1384, 1388-89 (N.D. Ill. 2016) (same, where claim based on inclusion of plaintiff's name and likeness on online lawyer directory webpage that displayed unrelated adjacent advertisements); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1324-26 (11th Cir. 2006) (dismissing Florida right of publicity claim based on inclusion of plaintiff's photograph on book cover displayed on defendant bookseller's website).

promoted as relying on large quantities of collective inputs rather than association with any particular source. *Id.* ¶ 136. Relatedly, Plaintiffs do not allege that their identities are meaningfully "[]related to the contents" of Meta's AI technologies. *Cross*, 14 Cal. App. 5th at 211 (quoting *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 693 (9th Cir. 1998)). Indeed, Meta's AI technologies do "not depict [plaintiffs]" by "name" or "identity" in any way. *Id.* at 212. Plaintiffs' theory—that training based on likenesses constitutes commercial appropriation—would also produce absurd results, for example by making liable every artist who practices portraiture by painting from photographs of real people. Their sweeping conception of the right of publicity is meritless. In sum, Plaintiffs' failure to allege that Meta has commercially appropriated their identities in the relevant sense is also fatal to their California right of publicity claims.

## III. PLAINTIFFS' CALIFORNIA CONSTITUTIONAL PRIVACY CLAIM FAILS

The California Plaintiffs' privacy claim under Article I, Section 1, of the California Constitution likewise fails because the Complaint does not plausibly allege that Meta used information from any California Plaintiff specifically for either a "NameTag" model or the GenAI models. *See supra* at 10-12, 15-17, 21. Without such a plausible allegation, the claim fails.

The claim fails on different grounds as well. "The California Constitution sets a 'high bar' for establishing an invasion of privacy claim." *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1038 (N.D. Cal. 2014). To state such a claim, a plaintiff must plead (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy. *Hill v. NCAA*, 865 P.2d 633, 654-55 (Cal. 1994). Plaintiffs satisfy none of these requirements.

*First*, Plaintiffs lack a legally protected privacy interest in public photos posted to Facebook or Instagram, or in the biometric information allegedly derived from such photos. The "legally protected privacy interest" analysis turns on "the nature of the information at issue," *In re*

*Yahoo Mail Litig.*, 7 F. Supp. 3d at 1041, and a protected interest exists in information that is "sensitive and confidential," *Hill*, 865 P.2d at 654, such as "[m]edical records pertaining to substance abuse treatment," *Cnty. of Los Angeles v. Super. Ct.*, 65 Cal. App. 5th 621, 642 (2021); *see also In re Yahoo Mail Litig.*, 7 F. Supp. 3d at 1040-41 (rejecting argument that plaintiffs had legally protected privacy interest "in emails generally," as opposed to specific "sensitive" or "confidential" information). Far from being "sensitive" or "confidential," the photos here were uploaded publicly by Plaintiffs themselves—or, in I.W.'s case, by her parent. Dkt. 1 ¶ 59.

Plaintiffs acknowledge that the accounts containing their photos were public for at least some periods. *Id.* ¶¶ 54, 61. And Plaintiffs allege no unique privacy interest in their facial images. Facebook and Instagram are "social media and messaging platforms" where users can connect with friends, families, or other communities. *Id.* ¶ 71. Moreover, Plaintiff Wahl alleges that he has "posted photos of himself" and I.W. to his Facebook and Instagram accounts "throughout [I.W.'s] life." *Id.* ¶ 59. Photographs shared to Facebook and Instagram, or any allegedly derived biometrics, are thus unlike the sensitive and confidential information maintained in medical records, and Plaintiffs lack a legally protected privacy interest in them. *See Ibarra v. Super. Ct.*, 217 Cal. App. 4th 695, 705 (2013) (no legally recognized privacy interest in service photographs of peace officers, reasoning that they had no "substantial interest in maintaining the confidentiality of [their] identity" and did not "require anonymity"); *Times-Mirror Co. v. Super. Ct.*, 198 Cal. App. 3d 1420, 1430 (1988), *opinion modified on denial of reh'g* (Mar. 25, 1988) ("Once official records are available for public inspection, there can be no privacy interest in their content.").

*Second*, Plaintiffs had no reasonable expectation of privacy in these publicly posted photographs or any alleged derived biometrics. In evaluating whether a reasonable expectation exists, courts "consider whether a defendant gained 'unwanted access to data by electronic or other

covert means, in violation of the law or social norms.'" *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1205 (S.D. Cal. 2024) (citation omitted). Plaintiffs uploaded these photographs to public Facebook or Instagram accounts, and such public sharing is incompatible with an expectation of privacy. *See Stackler v. Dep't of Motor Vehicles*, 105 Cal. App. 3d 240, 247 (1980) (no privacy violation for driver's license photograph requirement because "there simply can be no reasonable expectation of privacy in that which is already public"); *Carson v. Michaels Stores, Inc.*, 2011 WL 2120195, at *4 (Cal. App. May 31, 2011) ("[T]he fact [plaintiff's] address is easily obtained from a number of sources available to the public on the Internet undermines any reasonable expectation of privacy she has in such information."); *cf. Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 524-25 (C.D. Cal. 2021) (plaintiff's conduct in voluntarily providing information to defendant inconsistent with expectation of privacy, despite plaintiff's claim they were unaware a third party could access the data). Moreover, the photographs were uploaded to platforms owned and operated *by Meta*, which further demonstrates Plaintiffs' lack of a reasonable expectation of privacy *as to Meta*. *See Pioneer Elecs., Inc. v. Super. Ct.*, 40 Cal. 4th 360, 372 (2007) (individuals who had "already voluntarily disclosed their identifying information to [defendant] in the hope of obtaining some form of relief" lacked reasonable expectation that defendant would keep that information private).

Meta's public disclosures further confirm that Plaintiffs could not have a reasonable expectation that Meta would not use their uploaded data to train its AI models, including by allegedly analyzing facial geometry. As explained, the Meta and Instagram Terms and Privacy Policy disclose that user data including "photos and videos" is used to develop Meta's products. *See supra* at 23; *see also* Ex. J (Notice) (disclosing use of "face imagery"). Indeed, and as discussed above, Plaintiffs affirmatively consented to the precise conduct alleged here. *See supra* at 21-25. "A plaintiff cannot have a reasonable expectation of privacy if she consented to the

intrusion." *Saleh*, 562 F. Supp. 3d at 524; *see also TBG Ins. Servs. Corp. v. Super. Ct.*, 96 Cal. App. 4th 443, 452-53 (2002) (rejecting constitutional privacy claim based on collection of personal files from a computer where the defendant's "policy statement" "gave [plaintiff] the opportunity to consent to or reject the very thing that he now complains about" because that "defeats his claim that he had a reasonable expectation of privacy").

*Third*, Plaintiffs fail to allege a serious invasion of privacy. Meta's alleged use of photographs that their owners provided directly to Meta and shared publicly to train AI models does not constitute the type of egregious invasion of privacy actionable under the California Constitution. *See Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1143 (S.D. Cal. 2005) (act of "downloading photos from a publicly-accessible website and writing an article … was not an egregious breach of social norms underlying the state privacy right"). Indeed, Plaintiffs themselves or their parents provided the photographs directly to Meta, and the challenged conduct was fully disclosed by Meta in multiple locations.

Finally, to the extent Plaintiffs seek money damages for this claim, none are available. *See Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1127-28 (S.D. Cal. 2023) ("California's constitutional provision protecting the right of privacy … supports a cause of action for an injunction but it does not confer on a litigant a private right of action for damages." (citation omitted)); *Hill v. Workday, Inc.*, 2024 WL 3012802, at *15-16 (N.D. Cal. June 14, 2024) (similar).

In sum, Plaintiffs fail to plead any of the requirements for a constitutional privacy claim.

## CONCLUSION

The Court should dismiss the Complaint.

Dated: November 5, 2026

Respectfully submitted,

/s/ *Gary Feinerman*

Gary Feinerman (IL 6206906)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: 312-876-7700
gary.feinerman@lw.com

Melanie M. Blunschi (*pro hac vice*)
Nicole C. Valco (*pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: 415-391-0600
melanie.blunschi@lw.com
nicole.valco@lw.com

*Attorneys for Defendant Meta Platforms, Inc.*